PAUL STAM, JR. v. THE STATE OF NORTH CAROLINA; JAMES B. HUNT, JR., INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF NORTH CAROLINA; RUFUS EDMISTEN, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA; SARA MORROW, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HUMAN RESOURCES OF THE STATE OF NORTH CAROLINA; NORTH CAROLINA DEPARTMENT OF HUMAN RESOURCES; ROBERT WARD, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE DIVISION OF SOCIAL SERVICES OF THE DEPARTMENT OF HUMAN RESOURCES OF THE STATE OF NORTH CAROLINA; SOCIAL SERVICES COMMISSION; JAMES WIGHT, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE WAKE COUNTY DEPARTMENT OF SOCIAL SERVICES; WAKE COUNTY, A BODY POLITIC

No. 7910SC546

(Filed 17 June 1980)

1.  **Abortion § 4; Constitutional Law § 17– human fetus not "person" – no constitutional bar to State funding of abortions**

    A human fetus is not a "person" within the meaning of Art. I, §§ 1 and 19 of the N. C. Constitution, and the protections of those sections thus do not apply to the fetus so as to prohibit State funding for elective abortions.

2.  **Abortion § 4; Taxation § 7– use of State tax monies for elective abortions**

    The funding of elective abortions constitutes a "necessary use and purpose of government" within the meaning of G.S. 105-1, and the appropriation and expenditure of State tax monies for elective abortions does not violate Art. V, § 5 of the N. C. Constitution.

3.  **Abortions § 4; Counties § 6.2– State Abortion Fund – expenditures by counties – administrative rules -- statutory authority**

    In administering State funds appropriated by the General Assembly for the State Abortion Fund through the county department of social services, a county acts pursuant to administrative rules governing the Fund which were enacted pursuant to statutory authority since (1) the rules are not inconsistent with G.S. 130-254, which provides for the establishment of programs to improve perinatal care for low income pregnant women; (2) the rules are not inconsistent with G.S. 108-61 which adopted provisions of the federal Social Security Act, including a provision prohibiting federal funding of medically unnecessary abortions; and (3) the provision of funding for elective abortions fulfills the purpose stated in G.S. 143B-137 of providing services "in the fields of general and mental health," and the promulgation of administrative rules under G.S. 143B-153 satisfies the requirements of "necessity" to carry out the purposes of the Department of Human Resources in that it provides standards without which the State Abortion Fund could not lawfully be administered.

4. **Abortion § 4; Counties § 6.1; Taxation § 5.2– elective abortions – county's levy of taxes – statutory authority**

A county's levy of taxes with a rate limitation for the purpose of funding elective abortions for indigents is authorized by G.S. 153A-149(c)(30) because the taxation is for the purpose of providing a program of public assistance not required by G.S. Chs. 108 and 111 but which, like those required by Ch. 108, is directed to the problems of poverty; futhermore, the program for elective abortions constitutes a "social service program intended to further the health, welfare, education, safety, comfort, and convenience of its citizens" within the meaning of G.S. 153A-255 and is thus authorized by "other portions of the General Statutes" as required by G.S. 153A-149(g).

APPEAL by plaintiff from *Braswell, Judge*. Judgment entered 18 April 1979 in Superior Court, WAKE County. Heard in the Court of Appeals 17 September 1979.

This declaratory judgment action was brought against the State and against Wake County seeking judgment declaring unlawful the appropriation of State funds by the 1977 session of the General Assembly and the use of supplemental county funds to pay for elective abortions for indigents. Plaintiff is a citizen and taxpayer of North Carolina, residing and paying ad valorem taxes on real and personal property in Wake County, as well as paying miscellaneous State and County taxes.

The appropriations bill passed by the General Assembly for the fiscal year 1978-79, 1977 Sess. Laws (Second Session), Ch. 1136, included an appropriation of $1,000,000.00 for the funding of medically unnecessary abortions for indigent women. In order to implement the disbursement of funding, the Social Services Commission adopted administrative rules effective 1 February 1978, codified as 10 NCAC 42W.0001 et seq. These rules provide that the Fund was to be administered by the county departments of social services to reimburse eligible applicants at the maximum rate of $150.00 for first trimester abortions and $500.00 for second trimester abortions. The provisions, set out at 10 NCAC 42W.0001(3) et seq. specified that only medically unnecessary abortions performed within the first twenty weeks of pregnancy were reimbursable. Eligibility for the State Abortion Fund was to be determined by the county departments of social services on the basis of Title XX eligibility criteria for family planning services. The counties were

directed to provide to all eligible applicants family planning counselling, to arrange for the delivery of abortion services through appropriate medical providers, including licensed physicians, licensed hospitals, and certified abortion clinics. 10 NCAC 42W.0003(e)(2) provided that county funds, if needed and available, could be used to supplement the State Abortion Fund.

In his complaint filed 21 December 1978, plaintiff alleged that monies had been paid in the year 1978 out of the tax revenues of the State and of Wake County for the performance of medically unnecessary abortions; that the administrative rules pursuant to which the State Abortion Fund was established are unauthorized by statute; that if the rules are authorized by statute, the statute constitutes an unconstitutional delegation of legislative power; that the application of state monies is unconstitutional in that it violates Article V, § 5 of the State Constitution in failing to be an application for purposes stated in the Act levying the tax; that it is an unlawful drawing of monies from State and County treasuries in violation of Article V, § 7; and that it deprives aborted fetuses of their right to life and right to due process in violation of Article I, §§ 1 and 19 of the State Constitution.

On 6 February 1979, the State moved for summary judgment, and on 20 March 1979 Wake County made a similar motion. Based on pleadings, motions, affidavits, admissions, documents and oral argument, the trial court concluded that there were no genuine issues of material fact and granted summary judgment for the defendants, based on the following conclusions of law:

1. A live human fetus is not a legal "person" within the meaning of the North Carolina Constitution, Article I, Sections 1 & 19, and has no inalienable right to life nor right to due process, and accordingly the expenditure of public funds for medically unnecessary abortions of live human fetuses is not unconstitutional.

2. The application of tax monies for the purchase of medically unnecessary abortions of live human fetuses is

not in violation of Article V, Secion 5, of the North Carolina Constitution, and the drawing of public monies from the state and County treasuries for the purchase of medically unnecessary abortions of live human fetuses is not in violation of the Article V, Section 7, of the North Carolina Constitution, and accordingly the expenditure of public monies for medically unnecessary abortions of live human fetuses is not unconstitutional.

3. The legislative intent of the General Assembly as expressed in GS 130-254, *et seq.*, is not inconstant (sic) with the expenditure of public funds for medically unnecessary abortions of live human fetuses, and accordingly such expenditure is lawful.

4. The administrative rules under which the Defendants operate the North Carolina Abortion Fund, codified as 10 N.C.A.C. 42W.0001, *et seq.*, are fully authorized by GS 143B-153 and GS 14-45.1, are effective, and are the product of a lawful delegation of legislative authority consistent with the North Carolina Constitution, Article I, Section 6, and Article II, Section I, and accordingly the expenditure of public funds for medically unnecessary abortions of live human fetuses is not unconstitutional or in violation of statute.

5. The expenditure of public funds by Wake County for the abortions of live human fetuses is not *ultra vires.*

Plaintiff appealed from entry of judgment in favor of defendants.

Plaintiff appellant *pro se.*

*Attorney General Edmisten by Associate Attorney Steven M. Shaber for the State of North Carolina, appellee.*

*Michael R. Ferrell for Wake County, Appellee*

PARKER, Judge.

[1]  Initially, plaintiff contends that the use of state tax monies
for the funding of elective abortions through the State Abortion
Fund is unconstitutional because a human fetus is a "person"
within the meaning of Article I, Sections 1 & 19 of the North
Carolina Constitution and is therefore entitled to the constitu-
tional protections of those sections. We note at the outset that
there is no federal constitutional requirement that a state pro-
vide funding for elective abortions. *Maher v. Roe*, 432 U.S. 464,
97 S. Ct. 2376, 53 L. Ed. 2d 484 (1977). Thus, the narrow question
which plaintiff has initially raised on this appeal is whether the
North Carolina Constitution affords constitutional protection
to fetal life such that the state may not provide funds for the
performance of medically unnecessary abortions.

*Article I, § 1 of the Constitution of North Carolina provides:*

*The equality and rights of persons.* We hold it to be self-
evident that all persons are created equal; that they are
endowed by their Creator with certain inalienable rights;
that among these are life, liberty, the enjoyment of the
fruits of their own labor, and the pursuit of happiness.

Article I, § 19 provides in part:

*Law of the land; equal protection of the laws.* No person
shall be taken, imprisoned, or disseized of his freehold,
liberties, or privileges, or outlawed, or exiled, or in any
manner deprived of his life, liberty, or property, but by the
law of the land.

Although it is basic that constitutional guaranties should be
liberally construed, *see, Allred v. Graves*, 261, N.C. 31, 134 S.E. 2d
186 (1964), it is equally basic that such guaranties are not to be
construed as absolute or without limitations. In interpreting
the meaning of a word or phrase used in a constitutional provi-
sion, our courts have often attempted to ascertain the intention
of those by whom the constitution was adopted. *Elliott v. Board
of Equalization*, 203 N.C. 749, 166 S.E. 918 (1932); *Collie v. Com-
missioners*, 145 N.C. 170, 59 S.E. 44 (1907). Also, the courts of
this State have looked to interpretations of similar words or

phrases in the U.S. Constitution. Although decisions of the Supreme Court of the United States construing federal constitutional provisions are not binding on our courts in interpreting cognate provisions in the North Carolina Constitution, they are, nonetheless, highly persuasive. *Watch Co. v. Brand Distributors*, 285 N.C. 467, 206 S.E. 2d 141, (1974). Having considered both the probable intent of the framers of our Constitution, as well as the U.S. Supreme Court's interpretation of the similar wording in the Federal Constitution, we hold that a fetus is not a "person" within the meaning of Article I §§ 1 and 19 of the Constitution of North Carolina.

The intention of those by whom our Constitution was drafted should be determined by looking "to the history, general spirit of the times, and the prior and the then existing law . . . ." *Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E. 2d 512, 514 (1953). The "Law of the Land" clause was originally adopted as Section 12 of the Declaration of Rights which, by Section 44 of the Constitution of 1776 of North Carolina, was incorporated as a part of the State Constitution. Originally, the section protected a "freeman" only; however, in 1868 that limited protection was extended to protect a "person." In the same year, 1868, Article I, § 1 was newly added to reinforce the right of "all men" to life. The 1946 revisions amended the Constitution to the extent of substituting the word "person" for "men" in Article I, § 1, as well as in other sections of our Constitution. *See* Gardner, "The Continuous Revision of Our State Constitution," 36 N.C.L. Rev 297 (1958). Historical precedent persuades us that it was not the intent of those who drafted the Constitution to protect the unborn in the full constitutional sense. Although there is some dispute on the issue, the general conclusion of legal scholars is that abortion of an unborn child was not homicide at common law, and that consensual abortion was no crime at all. *See, e.g.,* Means, "The Phoenix of Abortional Freedom: Is a Penumbral or Ninth Amendment Right About to Arise from the Nineteenth-Century Legislative Ashes of a Fourteenth-Century Common-Law Liberty?," 17 New York Law Forum 335 (1971); Note, "The Law and the Unborn Child: The Legal and Logical Inconsistencies," 46 Notre Dame Lawyer 349 (1971).

The first reported case in which our Supreme Court applied the common law of abortion was *State v. Slagle,* 82 N.C. 653 (1880), in which it was held that it was a misdemeanor to administer a noxious drug to a pregnant woman with intent to produce an abortion. Upon later hearing of the same case, reported in 83 N.C. 630 (1880), the Court adopted the view of the courts of Pennsylvania: "It is not the murder of a living child which constitutes the offence (sic), but the destruction of gestation by wicked means and against nature. The moment the womb is instinct with embryo life and gestation has begun, the crime may be perpetrated." 83 N.C. at 632. It is apparent, then, that even though held to be a crime under the common law as adopted by this state, the crime was not murder, the taking of a person's life, but the destruction of the potentiality of life and, as such, merely a misdemeanor. Even when the crime of abortion was made a statutory offense in this State in 1881, it carried a maximum punishment of ten years imprisonment with a fine. 1881 Sess. Laws, c. 351, s. 1.

Neither is there any indication in the history of the civil law in this state that the fetus was ever regarded in the complete sense as a "person" prior to birth. This is not to say that the state did not accord certain rights and protections to the unborn child in anticipation of its eventual birth and capacity to exercise the full rights of a "person." At common law, a child *en ventre sa mere* could not acquire property by deed. *Dupree v. Dupree,* 45 N.C. 164 (1853). Such a child could, however, take by will *contingent upon his live birth. Barringer v. Cowan,* 55 N.C. 436 (1856); *see also, Mackie v. Mackie,* 230 N.C. 152, 52 S.E. 2d 352 (1949). As early as 1809 the North Carolina Supreme Court recognized that after-born children were entitled to a distributive share of an intestate's estate. *Hill v. Moore,* 5 N.C. 233 (1809). The common law as to deeds was changed by N.C. Rev. Code Ch. 43, § 4 (1854) which provided that an unborn infant in *esse "shall be deemed* a person capable of taking by deed or other writing, any estate whatever *in the same manner as if he were born."* (emphasis added). In discussing the modern successor to that statute, G.S. 41-5, our Supreme Court stated:

It seems clear to us that G.S. 41-5 gives to an unborn infant the same capacity to take property by "deed or other writing," as such infant has under the law governing its right to take by inheritance or devise .... By a legal fiction or indulgence, a legal personality is *imputed* to an unborn child as a rule of property for all purposes beneficial to the infant after his birth, but not for purposes working to his detriment. The interest taken by the child at birth dates back to the time of conception or to the later originating of the title, and cannot be defeated by intermediate proceedings to which he was not a party. (Emphasis Added).

*Mackie v. Mackie, supra* at 154, 55, 52 S.E. 2d at 354.

The view expressed in Mackie, that an unborn child may be a "person" for some purposes, is qualified in one significant respect: Live birth, the event which the "legal fiction" anticipates, is a condition precedent to the exercise of the property rights of the child *en ventre sa mere*. The rule of *Deal v. Sexton*, 144 N.C. 157, 56 S.E. 691 (1907), that an inheritance or estate of such a child may not be destroyed by judicial proceedings to which it was neither a party nor represented by a guardian ad litem is not inconsistent with the view that a fetus was not historically a "person" within the term's full legal meaning. In that case, the living heirs sought partition of a decedent's land prior to the birth of a child of decedent who was at the time of decedent's death *en ventre sa mere*. The court indulged, just as the court in the later *Mackie* case did, in the legal fiction which treats the unborn child *as if* a person in anticipation of the most common end result of human pregnancy, live birth.

Thus, viewing the common law which was in existence in 1776 when the "Law of the Land" clause became part of our Constitution, and early statutory enactments in existence in 1868 when Article I, § 1 was adopted, as well as considering later judicial interpretations of the rights of the unborn, we find no historical indication that the constitutional protections of those sections were intended to extend to the unborn child. This Court is, of course, aware that our State Constitution is an organic document, and that the interpretation of its language is subject to change to include new things and new conditions of

the same class as those specified which were not known or contemplated when it was adopted. *Purser v. Ledbetter*, 227 N.C. 1, 40 S.E. 2d 702 (1946). Clearly, the state of medical knowledge concerning fetal development is now far more advanced than at the time the State Constitution was adopted in the eighteenth century and amended in the nineteenth century. If the fact of biological life were the sole consideration here, plaintiff's argument would not fail, yet the reasons are compelling why the fact should not control. If the word "person" in Article I, § § 1 and 19 were now broadened in meaning to include the fetus, such interpretation would indirectly conflict with our federal Constitution. Bound as the courts of this state would be by the U.S. Supreme Court's holding in *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), that a woman has a substantive due process right to choose whether to have an abortion in the first trimester of pregnancy without any state interference, a fetus could be a "person" within the meaning of Article I, §§ 1 & 19 whose life could be protected from state funding of abortions, but whose life could not be protected in any manner inconsistent with the mother's right under *Roe*. Also, such an interpretation could have troublesome future implications. The State Abortion Fund at present only provides funding for medically unnecessary abortions. 10 NCAC 42 W.0001(3). Medically necessary abortions, those defined as necessary to save the life of the mother, to prevent severe and long-lasting physical health damage, or to terminate a pregnancy caused by reported rape or incest, are currently funded by the federal government. Should Congress ever elect to terminate such funding, a construction of the State Constitution which includes fetuses as "persons" would operate as an absolute bar to state assistance for abortions necessary to save the life of the mother or to terminate pregnancy caused by rape or incest.

Apart from historical and practical considerations, we are also guided by the decision of the U.S. Supreme Court in *Roe v. Wade, supra*. The phrase "The Law of the Land," used in Article I, § 19, of the Constitution of North Carolina, is synonymous with "Due Process of Law." *Watch Co. v. Brand Distributors, supra*. In *Roe v. Wade* the U.S. Supreme Court held that the word "person," as used in the Fourteenth Amendment due process clause, does not include the unborn. In reaching that

holding, the Court discussed in detail the background of the treatment of the unborn in light of ancient philosophy, the common law, and American statutory law through the nineteenth century. The Court's conclusion, based on such detailed considerations, as well as our own consideration of the historical background of the law in our own State, persuades us that the word "person" should not have broader meaning in the State Constitution than it has in the U.S. Constitution. Our ruling in the present case in no way implies that the unborn child is to be accorded no rights at all. The General Assembly may, in recognition of the potentiality of life, continue to grant the rights and privileges to the unborn which it chooses. We hold only that the protections of Article I, §§ 1 & 19 do not extend to the fetus so as to prohibit the funding here at issue.

[2] Plaintiff next contends that the appropriation and expenditure of state tax monies for elective abortions violates Article V, § 5 of the N.C. Constitution. That section provides:

> Every act of the General Assembly levying a tax shall state the special object to which it is to be applied, and it shall be applied to no other purpose.

The funds appropriated for the funding of abortions for indigents are derived from taxes levied under Chapter 105 of the General Statutes. While certain of the taxes imposed are subject to use for special limited purposes, *e.g.* G.S. 105-164.2 (sales and use tax for the support of the public school system), G.S. 105-435 (fuel tax for the use of the state highways), most of the taxes levied in Chapter 105 are subject only to G.S. 105-1 which provides in part:

> The purpose of this Subchapter shall be to raise and provide revenue for the necessary uses and purposes of the government and State of North Carolina ....

Plaintiff contends that because the administrative rules, 10 NCAC 42W.0001 *et seq.* specify that medically necessary abortions are not reimbursable through the State Abortion Fund, *a fortiori,* the appropriation of funds for abortions cannot be for the necessary uses and purposes of the State of North Carolina.

To say, as plaintiff does, that pregnancy itself creates no necessity for an abortion, is not to answer the legal issue involved. There is clearly no doubt that the appropriation of funding for other medical services is a legitimate and proper use of state tax monies to aid the poorer citizens of North Carolina. Because there is adequate funding available through Medicaid for medically necessary abortions, the General Assembly, by establishing a fund for elective abortions, has chosen to bridge the gap in coverage to ensure that low-income women have a meaningful opportunity to exercise their constitutional choice to terminate their pregnancies. While there is no doubt that a state may choose to influence a woman's abortion decision, *Maher v. Roe, supra,* by funding childbirth but not abortion, it is clear that if funding for childbirth could be considered a "necessary use and purpose of government," abortion funding is equally so. Admittedly, the State's interest in funding childbirth may be that of encouraging proper medical care to ensure the health of both mother and child, as well as to encourage childbirth itself, both certainly necessary uses and purposes of the government. Equally so, the State's interest in funding elective abortion may be that of ensuring, if an indigent women chooses abortion, that her health is protected through her ability to obtain competent professional medical care.

[3] Plaintiff's final contention on this appeal is that the expenditure of public funds by Wake County for elective abortions is *ultra vires.* The record discloses that the public funds expended by Wake County in 1978-79 included both state funds disbursed through the county department of social services and supplemental county funds derived from local tax revenues.

We consider first the question of the lawfulness of Wake County's use of state funds for this purpose. As an agent of the State, the County has no inherent power, but may exercise only those powers prescribed by statute and those necessarily implied by law. *Insurance Co. v. Guilford County,* 225 N.C. 293, 34 S.E. 2d 430 (1945). In administering state funds appropriated by the General Assembly for the State Abortion Fund, the County has acted pursuant to the administrative rules governing the Fund, 10 NCAC 42W.0001 *et seq.* Thus, whether the County has power to administer these funds appropriated for elective abor-

tions depends upon whether these rules were enacted pursuant to statutorily granted authority. The rules in question state in part that they were enacted pursuant to G.S. 143B-153. That statute creates the Social Services Commission of the Department of Human Resources and authorizes and empowers the Commission to adopt rules and regulations "under and not inconsistent with the laws of the State necessary to carry out the provisions and purposes of this Article." Subsection (7) of G.S. 143B-153 provides a broad grant of power to the Commission to adopt "rules and regulations consistent with the provisions of this Chapter," as an addition to the specific grants of rule-making power in subsections (1) through (6).

The purposes of the Article referred to in G.S. 143B-153, Article 3 of Ch. 143B, are stated in G.S. 143B-137 to be:

> It shall be the duty of the Department to provide the necessary management, development of policy, and establishment and enforcement of standards for the provision of services in the fields of general and mental health and rehabilitation with the basic goal being to assist all citizens — as individuals, families, and communities — to achieve and maintain an adequate level of health, social and economic well-being, and dignity.

Plaintiff contends on this appeal that the rules in question are neither consistent with state law nor "necessary" to carry out the above-stated purposes. In support of his contention that the regulations are inconsistent with state law, plaintiff relies on G.S. 130-254 which, in recognition of the high mortality rate among unborn children of mothers from low socioeconomic backgrounds, mandates the establishment of programs to improve perinatal care. That the State has decided on the one hand to provide care to low-income pregnant women who choose to bear children in the interests of promoting the birth of healthy children is in no way inconsistent with its decision to ensure proper medical care for those low-income women who choose to exercise their constitutionally protected right to terminate their pregnancies. Neither are the Rules inconsistent with provisions of G.S. 108-61 which adopt the provisions of the federal Social Security Act. It is true that the Social Security

Stam v. State

Act only provides funds for medically necessary abortions and that § 210 of the 1978 Departments of Labor and Health, Education, and Welfare Appropriations Act, Public Law 95-480, prohibits *federal* funding of medically unnecessary abortions; however, nothing in the statute either expressly or impliedly prohibits the states from providing such funds.

Further, that the rules governing administration of the State Abortion Fund provide only for abortions not strictly *medically* necessary does not imply that such rules are not "necessary" to carry out the purposes of the Department of Human Resources as required by G.S. 143B-152. The provision of funding for elective abortions fulfills the purpose stated in G.S. 143B-137 of providing services "in the fields of general and mental health," and the promulgation of administrative rules under G.S. 143B-153 satisfies the requirement of "necessity" in that it provides standards without which the State Abortion Fund could not lawfully be administered. Thus, because the rules empowering counties to apply state funds for elective abortions were duly adopted pursuant to an express grant of statutory authority, plaintiff's argument that the County was without power to use state funds is without merit.

[4] The second issue concerning the county is the lawfulness of the expenditure of its own funds derived from local taxation. Any power which the county has to expend funds to supplement those provided by the State Abortion Fund is granted under G.S. 153A-149. G.S. 153A-149(c)(30) provides that a county may levy property taxes with a rate limitation "to provide for the public welfare through the maintenance and administration of public assistance programs not required by Chapters 108 and 111 of the General Statutes". In turn, G.S. 153A-149(b)(8) authorizes the levy of taxes by counties without restriction as to rate or amount "[t]o provide for public assistance required by Chapters 108 and 111 of the General Statutes." G.S. 153A-149(g) limits the power to tax otherwise conferred in G.S. 153A-149 as follows:

This section [G.S. 153A-149] does not authorize any county to undertake any program, function, joint undertak-

Stam v. State

ing, or service not otherwise authorized by law. It is intended only to authorize the levy of property taxes within the limitations set out herein to finance programs, functions, or services authorized by other portions of the General Statutes or by local acts.

The levy of taxes and the expenditure of county revenues to fund a program of elective abortions for indigent women does not fall within the category of programs required by Chapters 108 and 111 of the General Statutes. Thus, G.S. 153A-149(b)(8) is inapplicable in the present case. Chapter 111 is intended to provide solely for aid to the blind. Although G.S. 108-59 requires the establishment of programs of "medical assistance" funded by federal, State, and county appropriations, G.S. 108-60 limits the use of funds to payment of medical expenses for eligible persons "when it is *essential to the health and welfare of such* person that such care be provided." (emphasis added).

We consider, therefore, whether taxation by the county and expenditure of funds for elective abortions for indigents is authorized by the language G.S. 153A-149(c)(30), and if so, whether the program of funding those abortions is "authorized by other portions of the General Statutes" as required by G.S. 153A-149(g). As to the first issue, we hold that the levy of taxes with a rate limitation for this purpose is authorized by G.S. 153A-149(c)(30), because the taxation is for the purpose of providing a program of public assistance not required by Chapters 108 and 111 of the General Statutes, but which, like those required by Chapter 108, is directed to the problems of poverty. *See Hughey v. Cloninger*, 297 N.C. 86, 253 S.E. 2d 898 (1979). Further, the undertaking of the social service through the use of county funds is authorized by "other portions of the General Statutes" as required by G.S. 153A-149(g). G.S. 153A-255 provides:

Each county shall provide social services programs pursuant to Chapter 108 and Chapter 111 *and may otherwise undertake, sponsor, organize, engage in, and support other social service programs intended to further the health, welfare, education, safety, comfort, and convenience of its citizens.*

The grant of power in this provision is sufficiently broad to permit the county to sponsor and support the program established by the State Abortion Fund through the levy of taxes and the expenditure of county funds.

The judgment appealed from is

Affirmed.

Chief Judge MORRIS and Judge MARTIN (Robert M.) concur.